Filed 10/2/23  In re N.S. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| In re N.S. et al., Persons Coming Under the Juvenile Court Law. | B327096 (Los Angeles County Super. Ct. No. 18CCJP00304C–D) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> S.C., <br><br> Defendant and Appellant. | |

APPEAL from an order of the Superior Court of the County of Los Angeles, Nichelle L. Blackwell, Judge Pro Tempore. Affirmed.

Megan Turkat Schrin, under appointment by the Court of Appeal, for Defendant and Appellant.

Tarkian & Associates, Arezoo Pichvai, for Plaintiff and Respondent.

———————————————

## I.   INTRODUCTION

S.C. (mother) appeals from an order terminating parental rights to two of her children, N.S. (a son born in 2012) and A.S. (a son born in 2014), under Welfare and Institutions Code section 366.26.[1]  She contends the juvenile court abused its discretion when it concluded that the beneficial parental relationship exception did not apply.[2]  We affirm.

---

[1]   All further statutory references are to the Welfare and Institution Code.

[2]   In her notice of appeal, mother also purports to appeal from the juvenile court's December 15, 2022, order denying her section 388 petition, but her opening brief does not raise a challenge to that order.  She therefore has waived her challenge to the denial of her section 388 petition.  (*Tiernan v. Trustees of Cal. State University and Colleges* (1982) 33 Cal.3d 211, 216, fn. 4; *Telish v. State Personnel Bd.* (2015) 234 Cal.App.4th 1479, 1487, fn. 4 ["An appellant's failure to raise an argument in the opening brief waives the issue on appeal"].)

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Jurisdiction*

On January 17, 2018, the Los Angeles County Department of Children and Family Services (Department) filed a section 300 petition on behalf of the children,[3] and the juvenile court detained them from mother.

On March 13, 2018, mother entered a plea of no contest to an amended petition that alleged father's history of drug use and mother's failure to protect the children from it placed them at risk of harm. (*In re D.S.* (Aug. 12, 2021, B309872 [nonpub. opn.].).)

The juvenile court sustained the petition and removed the children from mother. The court granted mother monitored visitation for nine hours per week and reunification services for the family. (*In re D.S., supra*, B309872.)

At the October 2, 2018, six-month review hearing, the juvenile court found that the extent of mother's progress in her case plan was substantial and therefore placed the children with her (as well as father). (*In re D.S., supra*, B309872.)

In a March 15, 2019, status review report, the Department advised that the family was struggling because mother had been convicted in a criminal court case and incarcerated since January 2, 2019. Pursuant to a plea agreement, mother was sentenced to 90 days in jail and, upon release, was required to

---

[3] At the time the petition was filed, mother's seven children by Juan S. (father)—D.S., J.S., N.S., A.S., X.S., Ju.S., and I.S. (the children)—ranged in age from nine years to five months old. Father is not a party to this appeal.

3

enroll in a six-month drug treatment program. (*In re D.S., supra*, B309872.)

In an April 19, 2019, last minute information, the Department advised that mother had been released from jail on April 4, 2019, and admitted to a six-month inpatient drug treatment facility. (*In re D.S., supra*, B309872.)

In a September 17, 2019, status review report, the Department explained that mother had consistently participated in her court-ordered programs, was doing well, and would be released from the facility on September 30, 2019. After her release, mother would be placed in a sober living facility for an additional six months where she would continue to drug test and attend a 12-step program. (*In re D.S., supra*, B309872.)

On October 1, 2019, the juvenile court removed custody of the children from father and released them to mother under Department supervision. (*In re D.S., supra*, B309872.)

B.      *Termination of Reunification Services and Selection of Permanent Plan*

In an April 10, 2020, detention report, the Department advised that on October 4, 2019, mother was incarcerated for violating the terms of her probation. She was released from custody on October 31, 2019, and returned to her sober living program. But, on February 7, 2020, mother was discharged from that program for noncompliance and again incarcerated. (*In re D.S., supra*, B309872.)

Based on the information in the detention report, the Department filed two petitions.[4]  The first, a section 342 subsequent petition, alleged that mother had made an inappropriate plan for the care of her children by leaving them with the maternal grandmother, whose home was cluttered with bags and infested with cockroaches and rodents and who allowed father unlimited access to the children in violation of the juvenile court's orders.  The second, a section 387 supplemental petition, alleged that mother had failed to comply with the court's orders to participate in parenting classes and individual counseling.  (*In re D.S., supra*, B309872.)

At an April 15, 2020, detention hearing, the juvenile court found that the Department had made a sufficient prima facie showing to warrant removal of the children from mother.  The Department placed N.S. and A.S. together in a foster home.  (*In re D.S., supra*, B309872.)

On June 9, 2020, N.S., A.S., X.S., and Ju.S. disclosed to the social worker that they had been sexually abused by maternal grandmother's male friend while they lived in her home.  They reported disclosing the abuse to maternal grandmother, who continued to allow the alleged abuser to have access to the children.  Mother and grandmother denied knowledge of the sexual abuse.  (*In re D.S., supra*, B309872.)

At the August 24, 2020, hearing on the petitions, the juvenile court sustained the section 342 petition and the section 387 petition as to count s-1.  The court also denied mother

---

[4]     On April 7, 2020, the Department applied for and received an interim order from the juvenile court authorizing the removal of the children from the maternal grandmother's house.

reunification services and ordered that the permanent plan goal for the children was adoption or legal guardianship. In addition, the court granted the parents in-person visitation with the children.

On June 3, 2021, the Department placed N.S. and A.S. with new foster parents G.H. and J.C. (the foster parents).

In its October 1, 2021, interim review report, the Department provided the following information about N.S. and A.S. based on its interview of one of their foster parents[5]: During mother's bi-weekly calls with N.S. and A.S., she would tell them that she was trying "'her best to get [them] back,'" causing the foster parent concern that mother was giving them false hope. Mother spent most of the calls speaking with N.S. and was "'disconnected'" from A.S. The foster parent also observed that, during one visit, N.S. ran to mother, hugged her, and became emotional; A.S., on the other hand, appeared "'stiff'" when he hugged mother. Mother spent more time during that visit interacting with N.S. than she did with A.S. The foster parent explained that although N.S. believed he would be returning to mother's home, A.S. did not share that belief. But they both also expressed a desire for adoption by their foster parents, if their siblings were adopted.

---

[5] When the social worker tried to interview N.S., she "was unable to obtain a meaningful statement from the child," who either refused to answer questions or provided one-word answers. A.S. responded to her questions, telling the social worker that he did not talk to mother during her calls, he did not know whether he wanted to live with mother, and he liked living in his foster home.

In an October 15, 2021, last minute information, the Department reported that mother, without first clearing the dates with the foster parents, promised N.S. that she would either take him to Chuck E. Cheese's for his birthday or have a party at the park. The foster parents rescheduled mother's upcoming visit with the children so they could celebrate N.S.'s birthday with him at Universal Studios. But mother then failed to attend the rescheduled visit. According to the foster parents, N.S. was disappointed, as mother had been promising him a cake and a celebration at the park.

In a February 9, 2022, status review report, the Department reported that N.S. and A.S. continued to live with the foster parents and appeared comfortable and happy. The foster parents ensured that N.S. and A.S. were "supported in all their needs" and continued to express a desire to adopt them.

In an August 4, 2022, status review report, the Department advised that the foster parents continued to express their willingness to adopt N.S. and A.S. They reported that N.S had "been receptive and [was] doing much better." A.S. was "doing very well in school and [had] received many achievement awards during the last school year."

The Department also reported that, during visits with N.S. and A.S., mother was "limited in her engagement with the children . . . and . . . continued to show disregard for the caregivers' requests when made." She also continued to tell N.S. and A.S during phone calls that "she [was] going to get them back . . . ," which upset and confused them.

On August 18, 2022, mother filed a section 388 petition requesting a change to the juvenile court's August 24, 2020, order establishing adoption as the permanent plan for N.S. and A.S.

According to mother, she had completed all court ordered services and had maintained housing for two years "such that [N.S. and A.S.] could be reunified with all siblings currently before the court . . . ." She therefore asked the court to order that N.S. and A.S. be returned to her home.

During her September 17, 2022, monthly visit with N.S., A.S., and her other children[6], mother brought food, party favors, a pinata, and individual gifts for each child. Mother, who appeared to be pregnant,[7] struggled "to keep watch of all [the] children while they played." At times, she was "oblivious as to where the children were and if they were safe." And, she did not appear to be engaging or conversing with the children.

On October 18, 2022, a social worker interviewed N.S. and A.S. They both stated that they wanted to live in the foster home and did not want to leave. N.S. told the social worker that he was well treated in the foster home, felt safe there, and did not want to leave if he was not able to return to his parents. A.S. stated that things in the foster home were going well and that he liked their new house. He felt safe in the home and did not want to leave if he was unable to return to his parents.

---

[6]    As noted, all seven children were declared dependents of the juvenile court and removed from mother during these proceedings. Parental rights to D.S. and I.S. were terminated.

[7]    Mother confirmed to the social worker that she was six months pregnant, but had not told her children about the pregnancy. Although she denied that she was pregnant by father, he told the social worker that the child was his eighth with mother.

During the October 29, 2022, monthly visit, mother brought the children food, toys, and candy. The children hugged mother, and N.S. gave her a doll he made with yarn.

During the November 5, 2022, monthly visit, mother brought breakfast; some of her children greeted her, but others required prompting. The social worker observed that N.S. was "very clingy to mother" and that "it was difficult for mother to handle all the children at once, as they all [had] different needs" and "the children did not listen to her . . . ." When A.S. fell and hurt his knee, mother did not console him.

On November 29, 2022, the social worker interviewed N.S., A.S., and the foster parents. N.S. said that his visits with mother were "good" and that she brought food and toys. When asked with whom he would like to live, N.S. responded, "I want to go back with my mom." When asked why, he explained, "I want to be with all my brothers[.] I don't want us to be separated anymore. I have so much family that I have not seen in a long time. Yes, I want to be back with my family."

A.S. also stated that during visits with mother, she would bring food and toys, and he would play with his brothers. When asked with whom he would like to live, he initially responded, "What did [N.S.] tell you?" The social worker again asked A.S. for his preference, and he stated, "[N.S.] told me that he was going to tell you that he wants to go back home." When the social worker reiterated that she wanted his preference, A.S. explained, "Well, I am okay with staying here, but if I can go home then yes, I want to go home. I want to be with all my brothers. I also know that my mom now has to take care of another baby too so, I don't know. So, I don't know if she would be able to take care of me. I just want us to be happy."

One foster parent advised the social worker that N.S. was "'attached to . . . mother'" and had "'expressed at times that he want[ed] to go with [her]." But he also explained that it had "'taken us time to get where the kids are now'" and that N.S. "'took the longest to adjust.'" The other foster parent related that mother's phone calls with N.S. and A.S. were "'very robotic'" and that the majority of the calls involved "'what . . . they want[ed her to bring] for [the next] visit.'" He also observed that mother had "'no control'" of the children during visits and that the foster parents in attendance would need "'to intervene and tell her to pay attention.'" Mother did not take the time to ask him how N.S. and A.S. were doing or whether they had made any progress. She also failed to ask about their mental health services, challenges at school, or if there had been any changes in their behavior.

During the December 3, 2022, monthly visit, mother brought breakfast for the children, as well as new games and toys. But she appeared "to struggle with what to ask her children and what to say to them in response." When mother brought out the toys and games, the children fought over them, and one of the foster parents was required to intervene. N.S. hugged mother and rubbed her stomach while she had her back turned to the other children.

The social worker spoke to N.S. about returning to his parents, and he "quickly" responded that he wanted to go back to them. Because N.S. had previously said he did not want to return home, the social worker asked what changed his mind. He replied that "he wanted to go home because [mother] was having a baby and he did not want to miss them." When asked the same question, A.S. also said that he wanted to return his parents

because he "thinks about them and misses them" after their visits. He explained that he did not know why he changed his mind, but that he wanted "to see his grandma and his uncle that he [did] not see anymore." He added that he knew N.S. wanted to return and that if N.S. returned, "he would have to go back too."

Before a scheduled visit with the children on December 10, 2022, mother informed the social worker that she would be late. While they waited for mother to arrive, A.S. told the social worker that he had changed his mind about returning to mother's home because there were "bugs in the refrigerator and mice in the home." A.S. claimed that N.S. wanted to go home "to help clean the mess." A.S. was not sure whether he would return, even if "they cleaned the mess . . . ." When mother arrived, she asked if the children could come to her car and see the new baby. The children crowded around the car and seemed excited to see and hold their new baby brother.

The social worker observed that mother struggled to express herself with A.S. and N.S., and the children would lose interest and walk away from her. In contrast, they listened to and respected the foster parents and had developed a strong bond with them.

On December 15, 2022, the juvenile court held a combined hearing under sections 388 and 366.26. The court denied the section 388 petition because mother had failed to demonstrate changed circumstances.

On mother's claim that the beneficial parental exception applied, the juvenile court stated that it would consider the three prongs articulated in *In re Caden C*. (2021) 11 Cal.5th 614 (*Caden C*.).

11

As to the first prong, the juvenile court concluded that mother had demonstrated that she had regular visitation and contact with N.S. and A.S.

The juvenile court continued, "The second prong is that there is a relationship, the continuation of which would benefit the child in this case. And the way that particular prong has been assessed is whether or not there is a substantial and emotional positive attachment between the children and the parents. . . . [¶] As it concerns [N.S. and A.S.,] however, I do believe that they have a positive attachment. I do not believe that it is a substantial attachment. I look at the wavering that [N.S. and A.S.] have had with respect to wanting to go back home, not wanting to go back home, then saying they want to go back home, then not wanting to go back home. That tells me that the positive attachment is not one that I would identify as substantial. In fact, [N.S.]'s most recent desire to . . . go home [is] so he can clean up the home and make sure they don't have the bugs and mice in it. That is not his job, not his responsibility. He is a child, and he is entitled to have a childhood and to grow. It is not his responsibility to say, 'I got to clean up all of the mess of my parents that they are not doing the work that they should do just so we can all have a home.' That is not appropriate. I don't believe that to be a substantial, positive attachment.

"As it concerns [A.S.], . . . when I look at his statements, he has recently said he doesn't want to go back home because of the . . . condition of the home . . . , and that he's afraid of living under those conditions again. I know he previously said that he would want to go back home as of December 3rd, 2022, but then as of December 10th, 2022, he said he doesn't want to go back home. Then [A.S.] is not always using his voice about what he wants

12

and relying on [N.S.].  He said, 'If [N.S.] wants to go back home, then I know I'll have to go back home too.'  It doesn't sound like he has this substantial positive attachment that he must absolutely need to go back home or else his life would end.  It sounds like he's relying—his feelings are directly intertwined and connected with [N.S.]'s feelings.  Maybe [N.S.] has some level of influence over [A.S.] that makes him think that his responses should be equivalent to [N.S.]'s responses.  [¶]  When I look at that second prong of [*Caden C., supra*, 11 Cal.5th 614] there is a positive attachment.  I don't believe it is a substantial positive emotional attachment.  I don't believe that that prong weighs in favor of the parents."

Finally, the court considered the third prong set forth in *Caden C., supra*, 11 Cal.5th 614:  "I do not find it would be detrimental to [N.S. and A.S.] to implement a termination of parental rights.  When I look at the progress that [the foster parents] have made with these two young men, they are doing an excellent job in taking care of them.  They are addressing the needs that these children have.  They are focused on the children's needs.  They are making sure that they get all of the services that they need in order to address their issues, and these children have come a long way being in the care, custody and control of [the foster parents].  . . .  [¶]  . . .  I believe that overall looking at the totality of the circumstances and applying the [*Caden C.*] analysis, I believe that all three prongs are not met to justify the parent/child bond exception as it concerns termination of parental rights."

The juvenile court therefore terminated parental rights to N.S. and A.S.  On February 14, 2023, mother filed a notice of appeal.

## III.   DISCUSSION

Mother contends she established that "there was a beneficial parental relationship [with N.S. and A.S.] due to [her] being a consistent and positive part of their lives and their sense of belonging to a family."  According to mother, "the detriment to [N.S. and A.S.] if this relationship was severed, overcame the preference for adoption, and . . . the juvenile court erroneously minimized the harm to the children from the loss of that relationship."

A.   *Beneficial Parental Relationship Exception*

"[T]he goal at the section 366.26 hearing is 'specifically . . . to select and implement a permanent plan for the child.' [Citations.]  To guide the court in selecting the most suitable permanent arrangement, the statute lists plans in order of preference and provides a detailed procedure for choosing among them.  [Citation.]  According to that procedure, the court must first determine by clear and convincing evidence whether the child is likely to be adopted.  [Citation.]  If so, and if the court finds that there has been a previous determination that reunification services be terminated, then the court shall terminate parental rights to allow for adoption.  [Citation.]  But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan.  [Citation.]" (*Caden C., supra*, 11 Cal.5th at pp. 630–631.)

One such enumerated exception to the termination of parental rights is the beneficial parental relationship exception. (§ 366.26, subd. (c)(1)(B)(i).)  In order to demonstrate that this exception applies, a parent must show:  "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child."  (*Caden C., supra*, 11 Cal.5th at p. 631.)

"As to the second element, courts assess whether 'the child would benefit from continuing the relationship.'  (§ 366.26, subd. (c)(1)(B)(i).)  . . . [T]he focus is the child.  And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'  [Citation.]"  (*Caden C., supra*, 11 Cal.5th at p. 632.)  It is the parent's burden to show "that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship."  (*Id.* at p. 636.)

"When it weighs whether termination would be detrimental, the court is not comparing the parent's attributes as [a] custodial caregiver relative to those of any potential adoptive parent(s).  . . . [C]ourts should not look to whether the parent can provide a home for the child; the question is just whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home."  (*Caden C., supra*, 11 Cal.5th at p. 634.)  Relevant factual determinations include "the specific features of the child's relationship with the parent and the harm that would come from losing those specific features," "how harmful in total

that loss would be," and "for the particular child, how a prospective adoptive placement may offset and even counterbalance those harms." (*Id.* at p. 640.)

"A substantial evidence standard of review applies to the first two elements." (*Caden C., supra*, 11 Cal.5th at p. 639.) "[T]he ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Id.* at p. 640.*)*

B.    *Analysis*

The juvenile court's conclusion—that although N.S. and A.S. had a positive attachment to mother, that attachment was not sufficiently substantial to establish the second prong of the beneficial parental relationship test articulated in *Caden C., supra*, 11 Cal.5th 614—is supported by substantial evidence.

When they were first detained from mother in January 2018, N.S., who was five and A.S. who was three, spent the next 10 months in foster case. Then, between October 2018 and April 2020, they were returned to the parents, but during large portions of that time, mother was either incarcerated or living in drug treatment programs and sober living homes. Moreover, in October 2019, the children were again removed from father, requiring mother to make arrangements for them to reside in the maternal grandmother's home. The court then authorized removal of the children from the maternal grandmother's home in April 2020 and placed in foster care. They were eventually placed with the foster parents. Thus, contrary to mother's assertion, N.S. and A.S. did not spend most of their lives in her

16

care. At the time mother's parental rights were terminated in December 2022, N.S. had been living in alternative placements almost as long as he had been in mother's care, and A.S. had been alternatively placed longer than he had been in her care.

Following the final removal of N.S. and A.S. from mother in April 2020, her interactions with them consisted of phone calls and monthly visits in a monitored setting. During the calls, mother repeatedly told them they would be returned to her, causing them to experience frustration and confusion when mother failed to keep that promise. The calls were also described as robotic. And, during the visits, although mother brought food and toys, she struggled to communicate meaningfully with the children. Moreover, although N.S. and A.S. missed their parents and other relatives following visits and, at times, expressed a desire to return to their home, on other occasions, they stated that they wanted to stay in their current placement and be adopted.

The evidence documenting mother's relationship with N.S. and A.S. was therefore sufficient to support the juvenile court finding that their attachment to her was not a "substantial, positive, emotional" one. (*Caden C., supra*, 11 Cal.5th at p. 636.)

Finally, we conclude that the juvenile court did not abuse its discretion when it concluded that the termination of parental rights would not be sufficiently detrimental to N.S. and A.S. to outweigh the benefits of adoption. The conflicting responses given by N.A. and A.S. on the issue of being returned to mother suggested that they were ambivalent about their current relationship with her. And, their interactions during calls and visits supported an inference that they would not suffer significant harm if those contacts terminated. On this record,

that N.S. and A.S. missed mother following monthly visits was insufficient, by itself, to support an inference of significant emotional detriment.

By contrast, the evidence of the significant benefits to be derived from adoption was substantial. It was undisputed that the foster parents had maintained a stable home environment for N.S. and A.S. and provided for all their needs. They appeared to be thriving in that home. On balance, that evidence supported a finding that the security and permanence of adoption would more than offset any harm that would flow from ending the relationships with mother.

Mother maintains that the juvenile court nevertheless abused its discretion under *Caden C., supra*, 11 Cal.5th 614 by focusing on an improper factor, namely, with whom N.S. and A.S. wished to reside, and equating it with the required detriment determination. According to mother, "the issue of whether a child wants to return home does not answer the question of emotional detriment."

The record shows that, following the removal of N.S. and A.S. from mother in April 2020, social workers repeatedly questioned them about whether they wished to be returned to her, and on different occasions they gave conflicting responses. In making its second-prong analysis, the juvenile court acknowledged their responses and considered them when evaluating the substance of the parties' relationship. But there is nothing in the record of the section 366.26 hearing to suggest that the court's subsequent weighing of whether termination of parental rights would be detrimental was based solely on the expressed preferences of N.S. and A.S. concerning placement. To the contrary, the record reflects that the court was well aware of

the three-prong analysis required by *Caden C., supra*, 11 Cal.5th 614 and both cited and followed its mandates, including the required weighing of detriment against benefits.  The court therefore did not abuse its discretion.

## IV.   DISPOSITION

The orders denying the section 388 petition and terminating parental rights are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KIM, J.

We concur:

RUBIN, P. J.

MOOR, J.

19